IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| MARY ANN METTER, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF EDWARD O. METTER, DECEASED,<br><br>         Plaintiff,<br><br>vs.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS,<br><br>         Defendant. | 8:13-CV-133<br><br><br>MEMORANDUM AND ORDER |
| JUSTIN ERICKSON and JENNIFER ERICKSON,<br><br>         Plaintiffs,<br><br>vs.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS,<br><br>         Defendant. | 8:13-CV-134<br><br><br>MEMORANDUM AND ORDER |

      This matter is before the Court on the defendant's motion to dismiss, or in the alternative, for summary judgment (case no. 8:13-cv-133, filing 13; case no. 8:13-cv-134, filing 13). The defendant has also moved to substitute the United States of America as the sole defendant. That motion will be granted and the United States will be substituted as the defendant. For the reasons discussed below, the defendant's motion to dismiss or for summary judgment will be granted.

**STANDARD OF REVIEW**

The defendant's motion to dismiss rests upon jurisdictional grounds, and is therefore properly considered under Fed. R. Civ. P. 12(b)(1). The party asserting subject matter jurisdiction bears the burden of proof. *Great Rivers Habitat Alliance v. FEMA*, 615 F.3d 985, 988 (8th Cir. 2010). A Rule 12(b)(1) motion can be presented as either a "facial" or a "factual" challenge. *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). When reviewing a facial challenge, the Court restricts itself to the face of the pleadings, and the nonmovant receives the same protections as it would facing a Rule 12(b)(6) motion. *Id.* By contrast, when reviewing a factual challenge, the Court considers matters outside the pleadings, and the nonmovant does not receive the benefit of Rule 12(b)(6) safeguards. *Id.* Moreover, unlike a motion for summary judgment, the Court is free to resolve disputed issues of fact. *Jessie v. Potter*, 516 F.3d 709, 712 (8th Cir. 2008). Here, the United States has brought a factual challenge, and the Court considers matters outside the pleadings.

**BACKGROUND**

On October 9, 2011, Edward O. Metter was fishing from the banks of the Missouri River near the Gavins Point Dam in Cedar County, Nebraska. Case no. 8:13-cv-133, filing 1 at ¶ 5.[1] With him were his son-in-law and his grandson, plaintiff Justin Erickson. Case no. 8:13-cv-134, filing 1 at ¶¶ 4, 9–10. While they were fishing, a pickup truck parked on a road above the river bank came out of gear, rolled down the bank, and struck Metter, killing him. Filing 1 at ¶ 10. To understand how this tragedy occurred, one must understand the area in question and the events leading up to that day.

Gavins Point Dam sits atop the Missouri River. The impounded waters of the river above the dam created Lewis and Clark Lake, a popular recreational area. Filing 14-1 at ¶ 3. The dam, lake, and associated facilities are operated and managed by the Omaha District of the United States Army Corps of Engineers ("the Corps"). Filing 14-1 at ¶ 3. Below the spillway and leading from the dam is a 4,700-foot long protective earthen structure known as the Training Dike. The Training Dike works in conjunction with the dam to "train" the river to flow in its current channel. Filing 14-1 at ¶ 4. Running along the crest of the dike is the Training Dike Road, a two-lane asphalt road. Filing 14-1 at ¶ 6. There is a recreation area at the Training Dike which is open to the public and used for, among other things, boating access, sightseeing, hiking, and day-use fishing. Filing 14-1 at ¶ 5. The banks of the Missouri River along the Training Dike are covered with riprap (large pieces

---

[1] Unless otherwise indicated, citations to the record refer to filings contained in case no. 8:13-cv-133.

of rock or rubble), which is used to protect the shoreline and prevent erosion. Filing 14-1 at ¶ 8. The riprap bank is a popular spot for fishermen, particularly for catching paddlefish in the fall months. Filing 14-1 at ¶ 5.

Parking is available on the river side of the Training Dike Road. The parking areas are not striped or designated for a particular manner of parking. The first visitors of each day typically determine the day's parking pattern, whether it be parallel, diagonal, front-in, or backing in. The Corps maintains the recreation area, the road, and the parking facilities. Filing 14-1 at ¶ 6. Most of the parking areas along the Training Dike Road are bordered by guardrails, either steel rails on wooden posts or cable guardrails. It is not known precisely when the guardrails were installed, but the Corps estimates that it was at least 30 years ago. Filing 14-1 at ¶ 7.

Due to historic flooding in May 2011, certain portions of the riprap needed to be repaired. Corps employee David A. Becker, who was the "Operations Project Manager," was responsible for these repairs. As Project Manager, Becker was primarily responsible for all Corps activities at the dam. Filing 14-1 at ¶¶ 1, 8. In June 2011, Becker decided to remove two small sections of guardrails along the Training Dike Road to allow heavy equipment to access the river shoreline. In order to facilitate flood-related repairs, the guardrails were left down and these areas were closed to the public. At some point during the last week of September 2011, after the riprap had been repaired and inspected for stability, the areas were made open to the public, without any guardrails in place. Filing 14-1 at ¶ 8.

Earlier that summer, an inspection of the remaining guardrails had revealed that many of the wooden posts were deteriorating. Becker decided to replace the guardrail posts along the Training Dike Road, with the goal of completing the work by September 30, 2011. Filing 14-1 at ¶ 9. On August 30, 2011, the Corps contracted C.B.M.C., a Tennessee firm, to install new guard posts along 3,350 feet of the Training Dike Road. At that point, all of the guardrails (with the exception of the two sections mentioned above) were still in place. The Corps allotted 1 month for completion of the project.

On September 19, 2011, the contractor visited the worksite and advised the Corps that he would return the following week to complete the project. Relying upon that assurance, and in an attempt to reduce contract costs, Gavins Point personnel removed the remaining guardrails and posts on September 28. Becker states that he did not believe this presented any danger to the public. So, no parking restrictions or warnings were posted, and the area along the river remained open for fishing. Filing 14-1 at ¶ 11.

Unfortunately, the contractor never showed up. From September 26 to October 7, 2011, the Corps made repeated attempts to contact C.B.M.C., without success. The contract was then re-awarded to the next lowest bidder

on October 26, and the guardrails were successfully replaced by November 30. Filing 14-1 at ¶ 12.

But on October 9, 2011, the guardrails had not yet been replaced along the Training Dike Road, where the truck that struck and killed Metter had been parked. Becker avers that, between September 28, when the guardrails were removed, and the date of the accident, nothing had occurred in the area to lead him to believe the public was in any danger. Filing 14-1 at ¶ 13.

The plaintiffs brought suit, alleging that the accident occurred as a result of the Corps' negligence in, among other things, failing to timely replace the guardrails, failing to reasonably inspect the parking area and provide a safe parking area, and failing to warn the public. Filing 1 at ¶ 12. Plaintiff Mary Ann Metter brings suit as the personal representative for the estate of her husband, Edward O. Metter. Case no. 8:13-cv-133, filing 1 at 1. Plaintiffs Justin and Jennifer Erickson bring suit on their own behalf, for the mental and physical harms to Justin caused by Metter's death (and witnessing Metter's death), and the loss of consortium that this, in turn, has caused Jennifer. Case no. 8:13-cv-134, filing 1 at ¶¶ 13–15. Although the plaintiffs have filed separate cases, their claims assert common theories of liability based upon the same facts. All of the plaintiffs' claims are brought under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 *et seq.*

## ANALYSIS

As a preliminary matter, the Corps has moved to substitute the United States as the sole defendant. The plaintiffs have not opposed this request. As the Court explains below, this substitution is appropriate. Therefore, the Corps will be dismissed as a defendant and the United States substituted in its place. Next, the United States moves to dismiss this case on jurisdictional grounds. Specifically, the United States argues that the Corps' decisions related to the removal and re-installation of the guardrails are protected by the discretionary function exception to the FTCA. Thus, the United States has not waived its sovereign immunity, and this Court lacks jurisdiction. Alternatively, the United States moves for summary judgment on the grounds that Nebraska's Recreational Liability Act, Neb. Rev. Stat. §§ 37-729–736, also shields the Corps from liability. The Court finds that the Corps' decisions are covered by the discretionary function exception to the FTCA. The Court therefore lacks jurisdiction over this case, and does not consider the United States' alternative argument under Nebraska's Recreational Liability Act.

## I. MOTION TO SUBSTITUTE

As noted above, all of the plaintiffs' claims are brought under the FTCA. Under the FTCA, the federal government has waived its sovereign immunity and allowed itself to be sued for claims based upon the negligent or wrongful acts of government employees acting within the scope of their employment. 28 U.S.C. § 1346(b)(1). However, the United States is the only proper defendant in an FTCA action. *See Smith v. United States*, 561 F.3d 1090, 1099 (10th Cir. 2009); *see also*, 28 U.S.C. § 2679(a); *Duncan v. Department of Labor*, 313 F.3d 445, 447 (8th Cir. 2002). Accordingly, substitution of the United States as defendant is appropriate. *Glorvigen v. Cirrus Design Corp.*, 2006 WL 3043222, at *1–2 (D. Minn. October 24, 2006); *see also Divers v. Halls*, 2013 WL 459633, at *2 (D. Neb. February 7, 2013).

## II. THE DISCRETIONARY FUNCTION EXCEPTION

The FTCA's waiver of sovereign immunity is not complete, and contains exceptions. At issue here is the "discretionary function" exception, which provides that no liability shall lie for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a); *see also Herden v. United States*, 726 F.3d 1042, 1046 (8th Cir. 2013) (en banc). If the discretionary function exception applies, it is a jurisdictional bar to suit. *Herden*, 726 F.3d at 1046.

A well-established legal framework applies to determine whether the discretionary function exception bars a party's suit under the FTCA. *Id.* This framework was set forth most recently by the Supreme Court in *United States v. Gaubert*, 499 U.S. 315 (1991). The first inquiry is whether the challenged conduct or omission is truly discretionary, that is, whether it involved an element of judgment or choice, or conversely, was "controlled by mandatory statutes or regulations." *Gaubert*, 499 U.S. at 328. If the challenged conduct is not discretionary, the exception does not apply. *Herden*, 726 F.3d at 1046. If the challenged action is discretionary, however, the second inquiry is whether the government employee's judgment or choice was based on considerations of "social, economic, and political policy." *Id.*

Before undertaking the *Gaubert* analysis, the Court must identify the precise conduct or omission that caused the harm, and more particularly, the underlying decisions. *See Garcia v. United States Air Force*, 533 F.3d 1170, 1176 (10th Cir. 2008). As noted above, the plaintiffs allege that the Corps was negligent in: (1) failing to replace the guardrails in a timely fashion when the Corps knew or should have known that members of the public would be fishing on the river bank, (2) failing to "make a reasonable inspection of the

- 5 -

parking area to determine if it was safe for public use," (3) failing to "properly maintain a reasonably safe parking area," and (4) failing to warn the public of the "hazardous condition" presented by the lack of guardrails. Filing 1 at ¶ 12.

Construing these allegations broadly, the Court views the plaintiffs' complaints as challenging the following underlying decisions by the Corps: (1) the decision of how and when to replace the old guardrails, and more specifically, the decision to temporarily remove the existing guardrails; (2) the decision of whether to allow parking to continue on the Training Dike Road once the guardrails were removed; and (3) the decision of whether to provide warnings—either urging drivers to exercise care in parking or warning fishermen of the presence of cars parked above.[2]

### A. Were the Decisions Discretionary?

According to Becker, there are only two regulations that arguably touched upon the decisions at issue. Both are found in chapter 3 of the Corps' Engineering Manual 1110-2-410, Design of Recreation Areas and Facilities – Access and Circulation. Filing 14-1 at 3. Even these sections are not precisely on point; chapter 3 of the Manual addresses "roadside facilities" such as scenic overlooks. Filing 14-1 at 5. The first provision, paragraph 3-3a(1) provides, in relevant part:

> Overlooks and their support facilities should be sited on gently sloping terrain. The area where the entrance, exit and parking facilities will be located should not exceed 7 percent grades and the section of roadway passing the potential site should not exceed 5 percent grade. These selected grades are guides to the designer to avoid despoilment of the site that is providing the opportunity to view the scenic beauty beyond the access point. Grades of the road providing access to the general area might be as great as 15 percent, but the road grade at the site and the terrain on which the overlook is developed should be close to the 5 percent grade.

---

[2] The Court does not view plaintiffs' second and third allegations of negligence as adding anything of substance to this analysis. The third allegation simply states that the parking area was dangerous, without specifying how, and is thus subsumed by the other, more specific allegations. And the second allegation, that the Corps failed to conduct a "reasonable inspection," is not necessarily on point. Even if the Corps had conducted a thorough inspection, the Corps would have been required to take further steps (such as replacing the guardrails, prohibiting parking, or providing warnings) to prevent the accident that occurred. For purposes of the present analysis, what plaintiffs are really challenging are the Corps' decisions not to take any of these specific safety measures.

- 6 -

Filing 14-1 at 5–6. And paragraph 3-3(a)(2), which concerns "site development," provides, in part:

> The overlook facilities should be set in the existing vegetation and geological assets of the site. The parking area should not occupy the dominant elevation of the site. The dominant elevation should be reserved for development of the viewing area from a standing or sitting position. Precipitous dropoffs should be made safe by the provision of appropriate railing. The railing should protect the very young and the very old but at the same time provide a height which protects the wheelchair visitor and permits normal and comfortable access to the views afforded other visitors.

Filing 14-1 at 6. Becker avers that, after inquiring, he was unable to locate any other statute, regulation, or policy that regulates the placement of guardrails near roadside facilities maintained by the Corps. Filing 14-1 at ¶ 10. Nor have the plaintiffs identified any other pertinent regulation or policy.

Neither of these provisions imposed a specific, mandatory duty upon the Corps to install or maintain (or to not remove) guardrails, to provide warnings, or to restrict parking along the Training Dike Road. First, it is doubtful that these provisions even apply to the decisions at issue. The first provisions concern only the grading of parking areas and overlooks, not the areas overlooked, such as the embankments here. And the second provision addresses guardrails put in place to protect pedestrians from falling off overlooks, not to prevent cars from rolling away.[3] Second, both provisions use permissive language, such as "should," and the first provides only "guides" to design. The use of permissive language, rather than mandatory terms, such as "must" or "shall," shows that these provisions are merely guidelines rather than mandatory requirements. *Herden*, 726 F.3d at 1047. Accordingly, the Corps retained discretion in determining whether and how to warn the public, install guardrails, and allow parking or fishing. So, the Court turns to the second half of the *Gaubert* inquiry.

---

[3] For that matter, the embankment along the river does not appear to have been the type of "precipitous dropoff" contemplated by paragraph 3-3(a)(2). "Precipitous" refers to something "having the character of a precipice," that is, "very steep, perpendicular, or overhanging in rise or fall." *Webster's Third New International Dictionary* 1784 (1986). In contrast, the slope of the embankment was, by Becker's measurements, 32.3 degrees, and the embankment was "commonly traversed by visitors to Gavins Point, including children and the elderly." Filing 14-1 at ¶ 14.

- 7 -

### B. Were the Decisions Susceptible of Policy Analysis?

The focus of the second inquiry—whether the government agent's decisions were grounded in policy considerations—is not on the agent's subjective intent, but on the nature of the actions taken, and whether they are susceptible to policy analysis. *Gaubert*, 499 U.S. at 325. Thus, "[t]he critical question is whether the acts or omissions that form the basis of the suit are susceptible to a policy-driven analysis, not whether they were the end product of a policy-driven analysis." *Shansky v. United States*, 164 F.3d 688, 692 (1st Cir. 1999); *see also C.R.S. by D.B.S. v. United States*, 11 F.3d 791, 796 (8th Cir. 1993). The test is whether "the conduct was of the type associated with the exercise of official discretion." *Gotha v. United States,* 115 F.3d 176, 180 (3d Cir. 1997).

Discretionary conduct is not confined to the policy or planning level. *Gaubert*, 499 U.S. at 325. This has two implications. First, even day-to-day "operational" decisions may involve the balancing of policy interests. *See, e.g.*, *id.* (management of banking industry by regulators overseeing "day-to-day affairs and operations"); *Hart v. United States*, 630 F.3d 1085 (8th Cir. 2011) (decisions related to arrest). Second, it is the nature of the conduct, not the status of the actor, that governs whether the discretionary function applies in a given case. *Layton v. United States*, 984 F.2d 1496, 1500 (8th Cir. 1993). In other words, the fact that determinations are made at a relatively low level does not prevent the exception from applying. *Id.*

Determining whether a decision is grounded in policy is "admittedly difficult, since nearly every government action is, at least to some extent, subject to 'policy analysis.'" *Cope v. Scott*, 45 F.3d 445, 448 (D.C. Cir. 1995). The determination requires a case-by-case approach, which has unfortunately led to some "disarray" in the caselaw. *Shansky*, 164 F.3d at 693. And courts have noted "the difficulty of charting a clear path through the weaving lines of precedent regarding what decisions are susceptible to social, economic, or political policy analysis." *Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005). Ultimately, governmental actions can be classified along a spectrum, "ranging from those totally divorced from the sphere of policy analysis, such as driving a car, to those fully grounded in regulatory policy, such as the regulation and oversight of a bank." *Terbush v. United States*, 516 F.3d 1125, 1129 (9th Cir. 2008). With these principles in hand, the Court returns to the decisions at issue.

### 1. The Decision to Remove the Existing Guardrails

The plaintiffs argue that they are not challenging the initial "decisions as to whether, how and when to replace the guardrails[,]" as such decisions

"were already made when the negligence occurred." Filing 18 at 8. Rather, the plaintiffs argue that once the Corps decided to replace the guardrails, it had a duty to do so in a non-negligent manner. The plaintiffs' choice not to challenge the initial decision makes sense, because that decision falls squarely within the discretionary exception function. Explaining why that is so will help understand why the subsequent decision to remove the guardrails—which, the Court finds, implicated the same policies—is also shielded by the exception.

In *Baum v. United States*, 986 F.2d 716, 718 (4th Cir. 1993), the plaintiffs were injured when their vehicle crashed through the guardrails on a bridge maintained by the National Park Service. 986 F.2d at 718. The bridge was designed in the 1950s, and the guardrails were built using cast iron, rather than a stronger material such as cast steel, that might have prevented the guardrails' failure. *Id.* at 721. The court held that the decision not to replace the posts was protected, stating:

> The decision of how and when to replace a major element of a substantial public facility is, like the decisions involving design and construction, at bottom a question of how best to allocate resources. Such a decision is inherently bound up in considerations of economic and political policy, and accordingly is precisely the type of governmental decision that Congress intended to insulate from judicial second guessing through tort actions for damages.

*Id.* at 724.

The decision of how to replace guardrails was also found to be protected in *Rich v. United States*, 119 F.3d 447 (6th Cir. 1997). In *Rich*, the plaintiff's husband and son were killed when their car crashed through the guardrail at a 90-degree turn at the bottom of a steep slope. *Id.* at 448. That portion of the road was maintained by the state, but the guardrail was maintained by the Army Corps of Engineers. One month earlier, another vehicle had crashed through the same guardrail. *Id.* at 449. Following that accident, the Corps decided to replace the guardrail with one of the same design, which once again failed when struck in the accident at issue. Nonetheless, the *Rich* court adopted the reasoning of *Baum* and held that the Corps' decision was protected.

The Court sees no meaningful distinction between the present case and the decisions found protected by the courts in *Baum* and *Rich*. The guardrails were a major element of a substantial public facility. *Baum* at 724. There were over half a mile of guardrails to be replaced. Filing 14-1 at ¶ 11. And the

- 9 -

Training Dike Road and associated recreation areas were themselves part of an even larger facility maintained by the Corps, which included the Gavins Point Dam and power plant, and Lewis and Clark lake, which, all told, receive more than one million recreational visitors annually. Filing 14-1 at ¶ 3. The decision to replace the guardrails required the Corps to balance the overall purpose of the Training Dike Road with the recreational uses of the area, the allocation of funds, and the safety of drivers and fishermen. *See Cope*, 45 F.3d at 451. Thus, the initial decision of how and when to replace the guardrails was protected by the discretionary function exception.

The plaintiffs make several good faith attempts to distinguish the subsequent decision to remove the existing guardrails. They point to the timeline of events. On September 19, 2011, the contractor originally selected to replace the guardrails visited the worksite and stated he would "return the following week to initiate, and complete, the work." Filing 14-1 at ¶ 11. However, the contractor never returned. The Corps repeatedly attempted to reach the contractor from September 26 to October 7, without success. Filing 14-1 at ¶ 12. The plaintiffs argue that by the time the Corps decided to remove the existing guardrails on September 28, it should have been apparent that the contractor was not going to perform in a timely manner, and it was therefore negligent to remove the guardrails.

More specifically, the plaintiffs argue that the decision to remove the guardrails constituted "non-discretionary negligence in the routine execution of a previous discretionary decision." Filing 18 at 8. The plaintiffs' argument actually consists of two parts: first, that once the Corps decided to replace the guardrails, it was bound by that decision, and second, that unlike the initial decision to replace, the decision to remove was not susceptible of policy analysis. The Court finds both parts unpersuasive.

As to the first point, it has already been established that no regulation or policy required the Corps to take any particular action with respect to the guardrails. The Corps could have decided to issue a binding policy on the matter, but the Corps did not. Instead, the decision was subject to the Corps' discretion. Exercising that discretion and deciding to replace the guardrails is not the same thing as deciding to issue a regulation, or forming a policy that would require the installation or maintenance of guardrails. And because the Corps had the discretion to decide how and when to replace the guardrails, it had the discretion to change that choice. *See Shansky*, 164 F.3d at 695.

Second, the decision to remove the guardrails pending their replacement was susceptible to the same policy analysis as the initial decision to replace them. The decision to remove the guardrails pending their replacement was, at its core, simply another decision regarding how and when to replace the guardrails. When the Corps made its initial decision, it

could have made any number of choices: to do nothing, to replace the guardrails at a later date, or to remove the existing guardrails without replacing them. The freedom to make any of these choices—socially desirable or not—is a necessary consequence of the Corps' discretion. And the Corps could have decided, at the outset, to remove the guardrails and leave them down for some period before they were replaced.

Because these decisions were of the same essential nature, the Corps' second decision was susceptible to the same underlying considerations as the first decision. The Court will assume, for the sake of argument, that by September 28, 2011, the Corps knew or should have known that the contractor was not going to show up in a timely fashion. That may very well have led a reasonable decisionmaker to decide that the interests of safety required the existing guardrails, run-down as they were, to remain in place for the time being. Or the Corps could have decided to simply close the area to parking or fishing in the meantime, just as it had closed certain areas of the river bank to deal with flooding earlier in the season. The facts affecting the balance of certain policy considerations—safety, cost, and recreational access—had changed and were a moving target. But that does not mean these fluid considerations were removed from the Corps' discretion.

This was not a decision, as the plaintiffs argue, that involved merely balancing "safety considerations under an established policy rather than the balancing of competing public policy considerations." *Aslakson v. United States*, 790 F.2d 688, 693 (8th Cir. 1986). In *Aslakson*, the plaintiff's son died when the mast of his sailboat collided with a power line maintained by the federal government. *Id.* at 689. The government's policy in that case "clearly required it to elevate its power lines if safety considerations compelled such action." *Id.* at 693. In the present case, there was no such established policy. Instead, the Corps made one choice, then another. Both were grounded in discretionary policy considerations.

The plaintiffs also argue that there is "no evidence that the manner in which the guardrails were replaced was one in which policy factors were weighed." Filing 18 at 8. Pointing to Becker's declaration that the guardrails were removed in an attempt to reduce contract costs, the plaintiffs argue that the decision to remove was based solely on budgetary considerations. The plaintiffs are correct in noting that considerations of cost alone will not always suffice to protect discretionary government conduct. *C.R.S. by D.B.S.*, 11 F.3d at 802. "Budgetary constraints underlie virtually all government activity." *ARA Leisure Servs. v. United States*, 831 F.2d 193, 196 (9th Cir. 1987). If being forced to choose between projects based upon the need to allocate scarce resources were always sufficient to invoke the discretionary function exception, then the exception would be so broad as to swallow the

waiver of immunity that the FTCA was designed to provide. *Id.* That said, while the "mere presence of budgetary concerns" will not shield allegedly negligent conduct, *Whisnant,* 400 F.3d at 1184, considerations of cost or resource-allocation may form part of the government's policy analysis. *See, e.g., Riley v. United States,* 486 F.3d 1030, 1034 (8th Cir. 2007); *Demery v. U.S. Dept. of Interior,* 357 F.3d 830, 833–34 (8th Cir. 2004); *Cope,* 45 F.3d at 451; *Baum,* 986 F.2d at 724.

But by focusing on what the Corps may or may not have actually considered, the plaintiffs' arguments miss the mark. "'The test is not whether the government actually considered each possible alternative in the universe of options, but whether the conduct was of the type associated with the exercise of official discretion.'" *Shansky,* 164 F.3d at 692 (quoting *Gotha,* 115 F.3d at 180); *see also Kiehn v. United States,* 984 F.2d 1100, 1105 (10th Cir. 1993) (government employees need not make an actual "conscious decision" regarding policy factors). Ultimately,

> an inquiring court need not ask whether government actors decided the point explicitly or actually discussed it, for the inquiry hinges instead on whether some plausible policy justification could have undergirded the challenged conduct. The critical question is whether the acts or omissions that form the basis of the suit are susceptible to a policy-driven analysis, not whether they were the end product of a policy-driven analysis.

*Shansky,* 164 F.3d at 692; *see also Gaubert,* 499 U.S. at 325. Even if the Corps' decision was actually based primarily on considerations of cost, it was susceptible to a balancing of several additional policy interests, and was therefore protected.

Finally, the plaintiffs argue that when the government "takes on the role of a private landowner," particular care must be taken in finding its decisions shielded by the discretionary function exception. *O'Toole v. United States,* 295 F.3d 1029, 1037 (9th Cir. 2002). Otherwise, "[e]very slip and fall, every failure to warn, every inspection and maintenance decision can be couched in terms of policy choices based on allocation of limited resources." *Id.*; *see also Whisnant,* 400 F.3d at 1183. The Court agrees with this statement of the law. But the proper context for this rule is demonstrated in *O'Toole* and *Whisnant*, both of which are distinguishable from the case at hand.

The plaintiffs in *O'Toole* owned a ranch which was damaged by flooding caused by the government's failure to maintain an irrigation system on its own adjoining property. 295 F.3d at 1031–32, 1037. The government had, for

over 15 years, simply failed to perform any meaningful maintenance on the system, despite warnings from the O'Tooles that flooding would result. *Id.* at 1032. The court held that this sort of "mundane question of routine ditch maintenance" was not the type of decision the discretionary function exception was designed to protect. It was "less like an FDA decision not to approve a drug for sale, *or a National Park Service decision not to put up a guardrail that will block visitors' views*, than like a government employee's negligent driving." *Id.* at 1037 (emphasis supplied).

In *Whisnant*, the government allowed toxic mold to colonize the meat department of a commissary over a period of 3 years. 400 F.3d at 1179. Over that period, the existence of the mold was revealed by reports, and several customers and employees became ill. *Id.* at 1180. Budgetary constraints alone could not justify this omission, and no other rational policy considerations were implicated. *Id.* "Cleaning up mold involves professional and scientific judgment, not decisions of social, economic, or political policy." *Id.* at 1183.

The Ninth Circuit has explicitly distinguished cases such as *Whisnant*, which involved merely "matters of routine maintenance" subject to ordinary budgetary constraints, from cases such as *Cope* and *Baum*, involving decisions about "'how and when to replace a major element of a substantial public facility.'" *Terbush*, 516 F.3d at 1133–34 (quoting *Cope*, 45 F.3d at 451). The Corps' decision to temporarily remove the guardrails was not a matter of routine maintenance, or a complete failure to perform *any* maintenance in the face of obvious hazards, as in *Whisnant* or *Terbush*. The decision, whether negligent or not, implicated broader policy concerns, and is therefore covered by the discretionary function exception.

### 2. The Decisions Regarding Parking and the Provision of Warnings

The plaintiffs also challenge the decisions of the Corps to allow parking to continue while the guardrails were down and to not provide warnings (to either drivers or fishermen). Both decisions raise similar considerations and can be addressed together. These decisions involve the Corps in its capacity as a manger of lands used, in part, for recreation. Other federal agencies, and in particular, the National Park Service, fulfill similar roles, and the Court finds particularly instructive cases involving national parks. "Generally, courts have held that decisions about what safety measures to employ in national parks and how to execute them involve balancing the same considerations that inform all policy decisions regarding the management of national parks: safety, aesthetics, environmental impact, and available financial resources." *Autery v. United States*, 992 F.2d 1523, 1530 (11th Cir. 1993); *see, e.g.*, *Elder v. United States*, 312 F.3d 1172 (10th Cir. 2002); *Mitchell v. United States*, 225 F.3d 361 (3d Cir. 2000).

Like the Park Service, when the Corps acts as manager of a land used for recreational purposes, it must balance public access with safety. *Terbush,* 516 F.3d at 1135–36. Specifically, deciding whether to allow parking to continue required the Corps to balance ease of access to recreational opportunities with public safety. Similarly, the decision of whether to issue warnings cannot be "boiled down to a simple recognition of the existence of some hazard. The entire process, including identifying hazards, determining which hazards require a warning, and determining how and when and where the warning should proceed, involves discretion." *Id.* at 1137; *see also Demery,* 357 F.3d at 833–34. Both decisions by the Corps were, by their nature, susceptible of policy analysis.

The decisions here resemble the decisions by the Park Service in *Terbush*. 516 F.3d at 1128. In that case, the plaintiffs' decedent was killed by a rockfall while climbing in a national park. Three weeks before his death, another rockfall had led park staff to close the area. *Id.* The area was declared safe by park officials 3 hours after that rockfall, and the climbing area was reopened without providing any warnings. *Id.* In deciding to allow climbing to resume and to not post any warnings, the officials exercised their discretion in determining the extent of the rockfall hazard and the appropriate response. *Id.* at 1139. The kinds of decisions involved in making these assessments—balancing safety, public access, conservation, and agency resources—are the kind protected by the discretionary function exception. *Id.*

The governmental decisions at issue in *Terbush* were, it turned out, grave errors. The errors may have resulted from an omission, from a mistaken balancing of the policies at issue, or from underlying mistakes of fact. Nonetheless, the errors were the products of discretionary, policy-based decisions, and were thus protected. Here too, the Corps was ultimately shown to be mistaken in its decisions to allow parking and to not post warnings, and in its overall assessment of the safety of the situation. But because the Corps' acts or oversights were grounded in policy (whether in fact or implicitly), they are shielded by the discretionary function exception. Any or all of these decisions may have been negligent. But the discretionary function exception applies whether or not the discretion involved be abused. 28 U.S.C. § 2680(a).

## CONCLUSION

The plaintiffs' claims are barred, in their entirety, by the discretionary function exception. Thus, the United States has not waived its sovereign immunity, and the Court lacks jurisdiction to hear the case. *Hart,* 630 F.3d at 1088. Because the dismissal rests upon jurisdictional grounds, however, it will be without prejudice. *Id.* at 1091. Accordingly,

IT IS ORDERED:

1.  The Corps' Motion to Dismiss, or in the Alternative, for Summary Judgment, and Motion to Substitute United States of America as the Sole Defendant (case no. 8:13-cv-133, filing 13; case no. 8:13-cv-134, filing 13) is granted in part, and denied in part, as follows:

    a.  The Corps' motion to substitute is granted. The Corps will be dismissed as a defendant, and the United States shall be substituted in its place.

    b.  The United States' motion to dismiss on jurisdictional grounds is granted,

    c.  The United States' motion for summary judgment is denied as moot.

2.  The plaintiffs' complaints (case no. 8:13-cv-133, filing 1; and case no. 8:13-cv-134, filing 1) are dismissed, without prejudice.

3.  A separate judgment will be entered.

Dated this 25th day of March, 2014.

BY THE COURT:

John M. Gerrard
United States District Judge